# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CA-01523-SCT

*CHARLES T. JONES, INDIVIDUALLY AND AS TAXPAYER AND CITIZEN OF MONTGOMERY COUNTY, MISSISSIPPI; AND THE MISSISSIPPI ETHICS COMMISSION*

*v.*

*BOBBY M. HOWELL, INDIVIDUALLY AND AS MISSISSIPPI STATE REPRESENTATIVE, DISTRICT 46; KILMICHAEL DRUGS, INC.; JOHN READ, INDIVIDUALLY AND AS MISSISSIPPI STATE REPRESENTATIVE, DISTRICT 112; AND DIVISION OF MEDICAID, OFFICE OF THE GOVERNOR, STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/27/1998 |
| TRIAL JUDGE: | HON. WILLIAM HALE SINGLETARY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | W. WAYNE DRINKWATER, JR. |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: GEOFFREY C. MORGAN |
| ATTORNEYS FOR APPELLEES: | JOHN R. REEVES |
| | JEFFREY C. SMITH |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED -06/27/2002 |
| MOTION FOR REHEARING FILED: | 7/24/2002; denied 10/10/2002 |
| MANDATE ISSUED: | 10/17/2002 |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case comes to this Court on appeal from the Chancery Court of the First Judicial District of Hinds County, Mississippi, where Charles T. Jones brought suit against Bobby M. Howell, a pharmacist and member of the Mississippi House of Representatives, for Howell's alleged violation of Article 4, Section 109 of the Mississippi Constitution. Section 109 forbids public officers from having a direct or indirect interest in a contract authorized by the public body of which they are members during their term of office and for one year thereafter. Jones complained that Howell's participation in the Legislature's appropriation of funds to the Mississippi Division of Medicaid and Howell's receipt of Medicaid funds as a pharmacist constituted a conflict of interest in violation of Section 109.

¶2. John Read, also a legislator and pharmacist, intervened as a party-defendant, and the Mississippi Ethics Commission was joined as a plaintiff by order of the court. After a trial, the chancellor found Howell and Read in violation of Section 109 and enjoined their further receipt of Medicaid funds. The chancellor denied the plaintiffs' request for restitution. The plaintiffs appealed to this Court from the chancery court's refusal to order restitution, and the legislators cross-appealed on the chancery court's finding that they violated Section 109.

¶3. In arriving at our decision, this Court is ever mindful that Section 109 serves the policy of protecting the public interest by "preventing graft of every possible sort, and secure the honest and clean administration of [governmental] affairs." *Noxubee County Hardware Co. v. City of Macon*, 90 Miss. 636, 43 So. 304, 305 (1907). Nevertheless, we are also mindful that Section 109 must not be interpreted too expansively, without regard to common sense considering modern, current circumstances and conditions. We will not allow or cause grave risks to state government, nor will we require that which is "thoroughly impracticable." *Frazier v. State ex rel. Pittman*, 504 So. 2d 675, 695 (Miss. 1987). We hold that the two legislators, Howell and Read, are not in violation of Section 109 and accordingly are not required to reimburse the state for funds accepted during their roles as providers through their respective pharmacies participating in the Medicaid program for the poor and needy. We, therefore, reverse and render the chancellor's judgment.

## FACTS AND PROCEEDINGS BELOW

¶4. Charles T. Jones, as a taxpayer and citizen of Montgomery County, Mississippi, filed a complaint against Representative Bobby M. Howell in the Chancery Court of Hinds County on July 24, 1995, alleging that because Howell's compensation as a Medicaid provider depends upon the appropriation of funds authorized by the Mississippi Legislature during his terms of office, he is "interested" in a contract authorized by the public body of which he is a member in violation of Section 109.

¶5. The Medical Assistance Program (hereinafter "Medicaid") is a cooperative program of the state and federal governments that provides medical assistance for the poor. *See* Title XIX of the Social Security Act of 1935, 42 U.S.C. §§ 1396 et seq. Under the Medicaid program, the federal government shares with the states the cost of reimbursing participating agencies, physicians and pharmacies for services rendered to eligible recipients. 42 U.S.C. §§ 1396a & 1396d. On the state level, the Mississippi Medicaid law, enacted in 1969, provides for a statewide system of medical assistance, to be administered by the Mississippi Medicaid Commission, now called the Division of Medicaid, Office of the Governor. Miss. Code Ann. §§ 43-13-101 et seq. (2000 & Supp. 2001). The Legislature annually appropriates money for the Mississippi Medicaid program.

¶6. To become a Medicaid provider, a pharmacist must submit an application and execute a Medical Assistance Participation Agreement (hereinafter "participation agreement") with the Division of Medicaid. Pursuant to the participation agreement, the pharmacist fills prescriptions for Medicaid recipients and submits claims for reimbursement to the Division of Medicaid. The Division of Medicaid reimburses each provider at the end of each month according to a specific formula. The formula was established by statute prior to 1992, and the formula cannot be varied by the Division of Medicaid. *See* Miss. Code Ann § 43-13-117(9) (Supp. 2001). The formula for prescription drugs provides that, for every prescription filled, the provider receives a dispensing fee of $4.91, without regard to the cost of the medicine. In addition to the dispensing fee, the provider also receives the average wholesale price of the medicine less ten percent of the

average wholesale price. The provider usually receives a discount from the drug company from which he or she purchases the medicine. This discount is generally sixteen to eighteen percent of the wholesale price. Thus, taking into account the formula, a provider may realize a gross profit of approximately six to eight percent on the cost of the medicine purchased, plus the dispensing fee of $4.91.

## Representative Howell

¶7. Bobby M. Howell was elected to the Mississippi House of Representatives, 46th District, in 1991 and initially took the oath of office in that body in January 1992. Howell has been reelected to that office and has served continuously in that office since 1992. A licensed pharmacist, Howell has practiced pharmacy in Kilmichael, Mississippi, since 1968. He has participated in the Medicaid program since 1970.

¶8. Howell was sole proprietor of Kilmichael Drugs from 1968 to 1995. He executed participation agreements in 1970, 1973, 1976 and 1980. During the time he was sole proprietor of Kilmichael Drugs, Howell received all Medicaid reimbursements directly. In July 1995, five days before this action was filed, Howell incorporated Kilmichael Drugs. Upon incorporation, Howell transferred all assets of the drugstore to the corporation, Kilmichael Drugs, Inc. He testified that a substantial factor in his decision to incorporate was the news that Jones was preparing to file this action. He testified that he incorporated the drugstore in order to shelter his assets.

¶9. Howell's wife, Charmayne Howell, serves as president and owner of Kilmichael Drugs, Inc. Howell's two children serve on the corporation's board of directors. Howell owns no stock in the corporation. He has no employment contract with the corporation, nor does he receive a salary. Howell testified that he draws money out of the corporation "as needed." Mrs. Howell executed a participation agreement in 1995 on behalf of Kilmichael Drugs, Inc. All Medicaid reimbursements are now received by the corporation. Jones sought declaratory and injunctive relief and asked that Howell repay the state $864,000 in gross funds which he had received from Medicaid.

¶10. During Howell's terms of office in the Legislature, the Legislature passed the following bills: several Medicaid appropriation bills. From March of 1992 through March of 1994, Howell voted "yea" in favor of seven bills that provided for Medicaid funding. In February of 1995 and March of 1997, Howell voted "present" on two house appropriation bills, and in April of 1996, Howell cast his only "nay" vote on one bill.

## Representative Read

¶11. John Read has served continuously as a member of the House of Representatives, 112th District, since January 1993. During his time in office, Read, also a licensed pharmacist, has been employed by Controlex Enterprise, doing business as Sav-Rex Pharmacy, in Gautier, Mississippi. Read testified that he is not a shareholder of Controlex, but that he is a salaried employee. Read testified that reimbursements from the Medicaid Division go directly to Controlex Enterprise, and any Medicaid funds received by Read are received only indirectly in the form of salary. Read stated that his salary is not based on a percentage of the corporation's Medicaid business.

¶12. Read executed a participation agreement in 1974 on behalf of Sav-Rex Pharmacy. The participation agreement bears Read's signature as partner. Prior to Read's testimony regarding his role at Sav-Rex, at the hearing on the motions for summary judgment, counsel for Read stipulated that Read is a partner in the drugstore, but that he is not the controlling partner. However, in an effort to clarify his employment status,

Read testified at trial that at the time the agreement was executed, he and two others were planning on establishing a partnership. However, because one of the partners backed out, the partnership was never formed.

¶13. Like Howell, Read has participated in the appropriation of funding to the Medicaid program. During Read's tenure in office-seven Medicaid appropriations bills were passed. Read voted "yea" on four bills, voted "present" on two bills, and was "absent" for the vote on one bill.

¶14. Both Howell and Read are required to file annually a sworn Statement of Economic Interest provided by the Mississippi Ethics Commission. *See* Miss. Code Ann. § 25-4-27 (1999). The statement requires a listing of all public bodies from which the legislator received compensation in excess of $1,000 during the preceding year. Neither Howell nor Read disclosed their receipt of compensation from Medicaid.

¶15. Jones filed this action against Howell in the Chancery Court of the First Judicial District of Hinds County on July 24, 1995, alleging that Howell's compensation as a Medicaid provider depends upon the appropriation of funds authorized by the Mississippi Legislature during his terms of office. Thus, Jones argues that Howell is "interested" in a contract authorized by the Legislature in violation of Section 109. On July 31, 1995, Jones filed an amended complaint, adding as a defendant Kilmichael Drugs, Inc. Jones requested a declaratory judgment that Howell violated Section 109 and that Howell is ineligible to hold office while receiving Medicaid reimbursements. Jones also requested injunctive relief prohibiting Howell from receiving, from the Medicaid Division or Kilmichael Drugs, Inc., Medicaid reimbursements while Howell is a member of the Legislature and for one year thereafter. The complaint and amended complaint also named the Medicaid Division as a defendant and requested injunctive relief prohibiting the Medicaid Division from disbursing Medicaid payments to Howell or Kilmichael Drugs, Inc. while Howell is a member of the Legislature and for one year thereafter. Additionally, the complaint sought restitution from Howell for compensation received from Medicaid in violation of Section 109.

¶16. Read intervened as a defendant. On March 11, 1996, the Mississippi Ethics Commission, having been joined as a party plaintiff by order of the court, filed a complaint in intervention against Howell, Kilmichael Drugs, Inc., and the Division of Medicaid.

¶17. On December 8-9, 1997, the chancery court denied the parties' motions for summary judgment and proceeded to a bench trial. The court entered its amended opinion and final judgment on August 31, 1998. The chancellor found that the interests of both Howell and Read violated Section 109. The court permanently enjoined Howell, Kilmichael Drugs, Inc., and Read from further receipt of Medicaid reimbursements, effective from the date of final judgment until one year after the expiration of Howell's and Read's respective terms of office. The court also permanently enjoined the Division of Medicaid not to reimburse Howell, Kilmichael Drugs, Inc., or Read for further Medicaid reimbursement payments, effective for the same period.

¶18. The chancellor denied the plaintiffs' request that the court require Howell and Read to reimburse the State for all Medicaid funds paid to them while they served in the Legislature. The chancellor stated that the plaintiffs' proof of net profits was "largely speculative and conjectural" and that the true amount of damages could not be reasonably ascertained. The chancellor also stated that there was no real injury sustained by the State that would support an award of damages.

¶19. The chancery court granted Howell's and Read's request for a stay of enforcement of the judgment

pending appeal. Jones and the Mississippi Ethics Commission filed notices of appeal to this Court. Howell and Read also filed notices of appeal. The parties raise the following issues:

**I. WHETHER THE CHANCELLOR ERRED IN FINDING THAT THE RECEIPT OF MEDICAID FUNDS BY HOWELL, KILMICHAEL DRUGS, INC., AND READ VIOLATED SECTION 109.**

**II. WHETHER THE CHANCELLOR ERRED IN FINDING THAT HOWELL AND READ SHOULD NOT BE REQUIRED TO MAKE RESTITUTION OF FUNDS RECEIVED IN VIOLATION OF SECTION 109.**

**III. WHETHER THE CHANCELLOR ERRED IN GRANTING A STAY OF ITS INJUNCTION PENDING APPEAL WITHOUT REQUIRING HOWELL AND READ TO POST BOND OR SECURITY.**

**IV. WHETHER THE CHANCELLOR ERRED IN NOT ADMITTING INTO EVIDENCE THE SUBMITTER AGREEMENT DATED JANUARY 9, 1992, AND THE DIRECT DEPOSIT AUTHORIZATION DATED AUGUST 14, 1992.**

**CROSS-APPEAL**

**I. DOES MISS. CONST. ART. 4, § 109 PROHIBIT A PERSON FROM SERVING IN THE MISSISSIPPI LEGISLATURE WHILE THAT PERSON ACTS AS A PROVIDER OF MEDICAL ASSISTANCE UNDER MISSISSIPPI'S MEDICAID LAW?**

**STANDARD OF REVIEW**

¶20. A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. *Consolidated Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999) (citing *Denson v. George*, 642 So. 2d 909, 913 (Miss.1994)). For questions of law, the standard of review is de novo. *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss.1990); *Cole v. Nat'l Life Ins. Co.*, 549 So. 2d 1301, 1303 (Miss.1989). The facts of this case are undisputed. The only questions are ones of law.

**DISCUSSION**

¶21. In applying Section 109 to Howell and Read, we combine Issues I, II, and the legislators' Issue I on Cross-Appeal for discussion purposes.

**I., II., & I. CROSS-APPEAL**

¶22. At issue in this case is the proper interpretation of Article 4, Section 109 of the Mississippi Constitution of 1890 which states:

No public officer or member of the legislature shall be interested, directly, or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.

The "landmark case" interpreting Section 109 is ***Frazier v. State ex rel. Pittman***, 504 So.2d 675 (Miss. 1987). In ***Frazier***, this Court stated that Section 109 prohibits any member of the Legislature from: (a) having any direct or indirect interest in any contract (b) with the state or any political subdivision (c) executed during his term of office or one year thereafter, and (d) authorized by any law, or order of any board of which he was a member. ***Id.*** at 693.

¶23. This Court has noted that while there is no difficulty in ascertaining (b) and (c) of the above factors, "it is (a) and (d) where the gray areas are encountered." ***Id.*** The case at hand involves an interpretation of factor (a). There is no issue regarding factor (d) as this Court has clearly held that legislative appropriations to state agencies "authorize" contracts funded by those appropriations. ***Cassibry v. State***, 404 So. 2d 1360, 1365-66 (Miss. 1981).

¶24. This Court observed in ***Frazier***:

> [I]t is clear this section is to protect the government. It is not a provision to protect individual rights. It is not concerned with whether some individual or class of individuals may suffer from its enforcement. As noted in ***Noxubee County Hardware Co.***, . . .the transgression test is intended to be mechanistic and objective, and motives and intentions of persons who violate it are immaterial. Its purpose is to remove any temptation to invade its proscription. It is also a self-executing section . . . . It prohibits an individual having an interest in a contract when he as a public officer served on the official body which enabled the contract to come into being. It is that simple. . . .

***Frazier***, 504 So.2d at 694.

¶25. Howell and Read contend that, in this case, it is not "that simple." In fact, we note initially that the participation agreements, which are the sole basis for the alleged violation of Section 109, are totally unlike any contract previously found by this Court to be within the scope of Section 109. None of the cases relied on by the chancellor involved the type of government welfare assistance program as exists in the case at bar. This Court has stated that while the effect of Section 109 must be "ascertained from the plain meaning of the words and terms used within it," the Court should look to "the evils to be avoided or cured, and thereby arrive at the reasonable meaning." ***Id.*** at 694 (quoting ***Ex parte Dennis***, 334 So. 2d 369, 373 (Miss. 1976); ***Trahan v. State Highway Comm'n***, 169 Miss. 732, 749, 151 So. 178, 182 (1933)). Though Section 109 sweeps broadly, this Court has acknowledged that there is an "edge to [its] target." ***Frazier***, 504 So.2d at 695 (citing ***Cassibry***, 404 So.2d at 1368). It is not required that one be a party to the contract in question to have an interest in the contract that violates Section 109. *See, e.g., **Cassibry***, 404 So. 2d at 1365-67 (holding that state senator who was attorney for party to contract with state was in violation of § 109).

¶26. Applying the factors set forth in ***Frazier***, the chancellor found that the participation of Howell and Read in Medicaid appropriations "directly or indirectly affect[ed] the availability of state funds for Medicaid reimbursements to Medicaid providers." The chancellor concluded that the participation agreements are contracts with the state that are authorized by the Medicaid appropriation bills. The chancellor concluded that Howell had and continues to have a direct financial interest in Medicaid reimbursements. The chancellor also concluded that Read had and continues to have an indirect financial interest in Medicaid reimbursements.

¶27. On cross-appeal, Howell and Read (hereinafter "legislators") argue that their participation as Medicaid

providers does not create a conflict of interest in violation of Section 109. They argue that the chancellor's application of the four-part test set forth in *Frazier* is overly expansive. For example, they contend that it fails to take into account modern developments in the Medicaid program and ignores the common-sense manner in which Section 109 should be applied. It is the following language from *Frazier* upon which they rely:

> Our interpretation [of § 109] should not be "too literal," and we have recognized that no constitutional prevision [sic] requires to be done that which is "thoroughly impracticable." We have likewise stated that our Constitution should be interpreted:

> ... In the light of developments which have appeared at the time of interpretation, and may therefore include things and conditions which not only did not exist but were not contemplated when it was drafted, so long as the new developments are in their nature within the scope of the purposes and powers for the furtherance of which the constitution was established.

> . . . . [N]o meaning, however abstractly valid should be carried into practical effect if doing so would cause grave risks to be imposed on the government of the people of this State. Such an interpretation would insult the common sense of our predecessors when they adopted § 109.

*Frazier*, 504 So.2d at 694-95 (citations omitted).

¶28. The legislators contend that Section 109 should be interpreted in light of "the role of government and the private sector in the provision of aid to the poor." They explain that the participation agreements are "simply means of providing financial aid to the needy." They argue that they are merely conduits that distribute the medication. The State provides the funding for the health care, and the needy choose from whom they will obtain the services.

¶29. The legislators state that the purpose of Section 109 is to protect the public interest by "preventing graft of every possible sort, and securing the honest and clean administration of municipal affairs." *Noxubee County Hardware Co. v. City of Macon*, 90 Miss. 636, 43 So. 304, 305 (1907). They contend that there is no danger of self-dealing by Medicaid providers in legislative roles because the appropriations to Medicaid do not affect the amount that the providers are reimbursed. Similarly, there is no incentive for them to vote one way or the other on appropriation bills because the amount of money they make depends, not on how much money is appropriated, but on how many Medicaid recipients choose to use their pharmacy. We agree.

¶30. The purposes of Section 109 are to instill public confidence in the integrity of government and to remove any temptation to invade its proscription. *[Hinds Community College Dist. v. Muse](#)*, 725 So. 2d 207, 211 (Miss. 1998); *State ex rel. Miss. Ethics Comm'n v. Aseme*, 583 So. 2d 955, 958 (Miss. 1991). The questions are whether Howell and Read, by voting on appropriations to the Medicaid program, are guilty of self-dealing and whether their interests could reasonably be expected to influence their judgment. *Smith v. Dorsey*, 530 So. 2d 5, 12-13 (Miss. 1988) (Prather, J., concurring in part and dissenting in part).

¶31. The decision of the Georgia Supreme Court in *Georgia Dep't of Med. Assistance v. Allgood*, 320 S.E.2d 155 (Ga. 1984), supports the legislators' interpretation of the participation agreements. The question in *Allgood* was whether nursing homes and pharmacies owned by members of the state legislature

or their spouses may, consistent with Georgia's Code of Ethics, receive Medicaid reimbursements from the state. The Georgia Supreme Court held that the legislators' interests did not violate the Code of Ethics. The court determined that the pharmacies were selling property to the Medicaid recipients, not to the state. The *Allgood* court also referred to various opinions holding that the state is not a purchaser of prescription drugs dispensed to medicaid recipients because the state never obtains title to or possession of the drugs; and therefore, the state does not have a proprietary interest in the drugs. *Allgood*, 320 S.E.2d at 158-59. In the case at bar, likewise the reality is that funds appropriated to Medicaid are for the benefit of the poor and needy recipients, not the providers. Thus, pharmacists like Howell and Read are mere conduits of medical assistance to these poor people who are eligible for Medicaid.

¶32. In the case at bar, we find that the legislators' interest in Medicaid appropriations is so remote as to remove them from the purpose of Section 109. We accept the legislators' argument that no decision Howell or Read make in voting on a Medicaid appropriation bill can affect the amount of reimbursements they receive. They cannot negotiate a contract with the state for a better or different price which they can charge. The reimbursement rates for prescription drugs are fixed by law. Miss. Code Ann. § 43-13-117(9). In their individual decisions to purchase medications, Medicaid recipients themselves, not the Legislature, control whether Howell and Read receive reimbursements. A Medicaid recipient is entitled to choose to purchase drugs from the legislators' respective pharmacies before the State is obligated to pay the provider. Therefore, neither Howell nor Read can affect the level of reimbursements they individually might receive by a vote appropriating funds to the state's Medicaid program. They have absolutely no control over this situation.

¶33. As we stated in *Frazier*, "[N]o meaning, however abstractly valid, should be carried into practical effect if doing so would cause grave risks to be imposed on the government of the people of this State. Such an interpretation would insult the common sense of our predecessors when they adopted § 109." 504 So. 2d at 695. This Court cannot fathom that the framers of our Constitution intended such an interpretation and harsh result as the chancellor imposed upon these two legislators. *Id.* Thus, there are "practical limits" to the application of Section 109. Common sense dictates that the Medicaid participation agreements simply are not the types of contracts contemplated by the framers of Section 109. Rather, as the legislators contend, the "Medicaid program and the participation agreements under which Howell and Read operate are simply means of providing financial aid to the needy." Pharmacists like Read and Howell do, in fact, serve as conduits for the provision of benefits to the needy for health care. Certainly no one denies the fact that the provider agreements allow the providers to be reimbursed for Medicaid prescriptions. However, when the Court examines the substance, as opposed to the form, of the agreements between the pharmacies and the Division of Medicaid, it becomes clear that the agreements are "merely a means of assuring that providers comply with Medicaid laws and regulations" and that they are not the types of contracts contemplated by Section 109. A similar situation is existed in *Aseme*, 583 So. 2d 955. There, a physician obtained benefits due to having public hospital staff privileges and yet he served on the hospital's board of trustees. This Court held that such was not a contract for Section 109 purposes because his compensation was not dependent on these privileges and the danger of graft and self-dealing arising from simultaneous service on the board is too attenuated. *Id.* at 959-60. Here, we also note that there is no danger of graft or self-dealing arising from these two legislator pharmacists participating in the Medicaid program as providers.

¶34. We decline to place Howell and Read in the same category with the attorney/senator in *Cassibry v. State*, 404 So. 2d 1360 (Miss. 1981), who was the as corporate counsel for a company named

Developmental Learning Associates (DLA), which contracted with the State Department of Public Welfare. Cassibry was held to be directly interested in the contract. *Cassibry* is distinguishable from the case sub judice because any compensation received by Cassibry from DLA came from profits from the contract with the Welfare Department, as the company had no other sources of income. We conclude that neither Howell nor Read is in the same category with Cassibry. They both merely receive reimbursements for prescriptions they fill for Medicaid recipients. As previously mentioned, the individual recipients themselves, in effect, determine the number of reimbursements they receive. Regardless of their ability to vote in the Legislature for Medicaid funding, they do not have control, either direct or indirect, over the amount of compensation their respective pharmacy receives from the state agency. This was not the case in *Cassibry*.

¶35. Also distinguishable in favor of the legislators is *Frazier*. In that case teachers/legislators benefitted from a simple direct line of appropriation--from the Legislature to the employer of the teachers/legislators for the purpose of funding their salaries. The line of appropriation in the case at hand is not that direct nor is the purpose that significant. After legislative approval, the appropriations go to the Division of Medicaid. The pharmacist must submit claims to the Division of Medicaid, which then reimburses the pharmacist. Again, a significant link in this chain is the role of the Medicaid recipients who may or may not choose to submit prescriptions to the particular pharmacist. Also, noteworthy is the fact that the reimbursements do not constitute the pharmacist's total income as was the case of the appropriations at issue in both *Frazier* and *Cassibry*. In *Frazier*, the appropriations, once approved by the Legislature, went directly to the employer of the teachers/legislators for the purpose of totally funding their salaries. Also, in *Cassibry*, DLA's contracts with the Department of Welfare were DLA's sole source of income. *Id.* at 1364. Here, the legislators' salaries are not linked to or based upon the amount of Medicaid reimbursements their pharmacies receive.

¶36. If the legislators had used their position in the Legislature to gain special privileges that were not available to all others in his class, a true conflict of interest would exist. For instance, if they had entered into a contract made available to them because of their position and that contract gave them pricing advantages over other licensed pharmacists, then a genuine conflict would exist. If they obtained a specific certificate to operate a privately-owned business exclusive of the rights of others, then a conflict would exist. If, while serving in the Legislature, they had in any way assisted to modify their rights to act and practice as a pharmacist in Mississippi, then a conflict would exist. Under the facts of the case at hand, however, the legislators have neither modified nor gained any rights that are not identical to the rights of all others in their class. Equally important is the fact that the Medicaid program allows them no right to negotiate a contract that is any different from those entered into by every other member of their class, nor are they granted any exclusive privilege or contract to singly represent any state or other governmental agency. In fact, they cannot negotiate at all. Their alleged sin in this case was the execution of a form "Participation Agreement" authorizing them to directly receive Medicaid reimbursements. The form they signed was identical to the same forms executed by all other Mississippi pharmacists who would agree to service Medicaid clients. This form amounted to nothing more than a license to fill prescriptions for Medicaid clients. They received no special preference over other pharmacists unlike the situation in *Cassibry*, 404 So. 2d at 1365-66, nor did their licensing prohibit others from serving in a public position unlike the situation in *Frazier*, 504 So. 2d 675, and *Muse*, 725 So. 2d at 213.

¶37. Strong public policy considerations undergird the need for a reasonable interpretation of Section 109. Nor should Section 109 be applied in a manner which would render vast sectors of our society ineligible for service in our Legislature. As we noted in *Frazier*,

> No social, political or economic section should be precluded by law from running for the Legislature without good reason. Any evil sought to be avoided by § 109 would become attenuated by prohibiting a prospective legislator from serving the public. Such a prohibition, when balanced against the potential harm to our people, goes beyond any possible intent or purpose of this section. . . .

*Frazier*, 504 So. 2d at 696-98. In a representative democracy the legislative branch of government should be sprinkled with members from all walks of life. Representative democracy is strengthened when representatives and senators truly reflect the professional, gender, racial, and geographic diversity of the population at large. The need for members who possess particular skills as a result of education and training cannot be overemphasized. Neither should we be blind to the fact that members from isolated or rural areas of the state may be unfairly prohibited from serving simply because of a radical interpretation of Section 109 which wholly fails to apply common sense with consideration of modern economic, cultural and political circumstances or conditions.

¶38. If the trial court's interpretation were to prevail, the legislators would be faced with the dilemma of either resigning from the Legislature or refusing to provide a valuable service to the citizens of their respective districts. Such an outcome could not have been considered, much less have been the intent of the framers of our 1890 Constitution when they adopted Section 109. In those days society did not enjoy the overlapping rights, privileges, and responsibilities found in today's world where oftentimes local, state, and federal governmental programs interrelate and interact. The concept of a welfare state and various programs for the needy did not emerge until the 1930's. If these legislators are in violation of Section 109, so too would any legislators who are Medicaid recipients, Medicaid doctors, or shareholders in other companies which provide Medicaid services. Other examples which would be problematic: (1) Legislators/attorneys would not be eligible to be appointed to represent indigent defendants in criminal cases who are paid with county or state funds appropriated in whole or in part by the Legislature. (2) Neither legislators nor their family members would be eligible for student loans pursuant to Miss. Code Ann. §§ 37-51-1 to -21 & §§ 37-145-1 to - 73 (2001) because they are funded by legislative appropriations. Thus, while Section 109 is laudable, its application must be tempered and balanced according to the facts of each case.

> The need for honesty in government must be balanced against the legitimacy of public officials having private interests. Otherwise, [restrictions like § 109 and implementing statutes] could effectively deter qualified people with expertise in their respective fields from entering public office for fear that any private interest could result in a conviction for having a conflict of interest.

Susan Denise Morgan Guerieri & George Mitchell Simmerman, Jr., Recent Decision, 52 Miss. L.J. 659, 677 (1982) (footnotes omitted).

¶39. Simply put, Section 109 must only be interpreted by this Court to provide a rational prohibition against self-dealing and abuse of power. We find that the best analysis hinges upon whether an individual member of the Legislature was in a position to advance the rights and benefits for himself, his friends and family beyond common rights and responsibilities provided to other members of his professional class. We hold that there is no violation of Section 109 by either Howell or Read. Accordingly, we reverse and render the chancellor on his finding that the legislators violated Section 109.

### III. & IV.

¶40. The Ethics Commission raises the two remaining issues in its "Statement of the Issues" contained in its initial appellate brief. However, it makes no argument regarding the issues in its briefs and provide no supporting authority. It is the duty of an appellant to provide authority in support of an assignment of error. *Hoops v. State*, 681 So. 2d 521, 526 (Miss. 1996); *Kelly v. State*, 553 So. 2d 517, 521 (Miss. 1989); *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983); *Ramseur v. State*, 368 So. 2d 842, 844 (Miss. 1979). This Court considers assertions of error not supported by citation of authority to be abandoned. *Thibodeaux v. State*, 652 So. 2d 153, 155 (Miss. 1995). Because the Ethics Commission has failed to meet the burden of providing authority to support these assignments of error, these issues are procedurally barred. *Drennan v. State*, 695 So. 2d 581, 585-86 (Miss. 1997).

## CONCLUSION

¶41. The chancellor erred in concluding Howell and Read violated Section 109. Therefore, neither Howell nor Read is prohibited by Section 109 from serving in the Legislature while acting as a provider of medical assistance under the Medicaid statutes. We reverse the chancery court's judgment, and we render judgment finally dismissing the plaintiffs' amended complaints and this action with prejudice.

¶42. **REVERSED AND RENDERED.**

**PITTMAN, C.J., COBB, EASLEY AND CARLSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. WALLER, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶43. Because the majority has changed the meaning of § 109 as it was twice affirmed by the citizens of this state, I dissent. The majority states that in addition to using common sense when interpreting §109, "this Court is ever mindful that section 109 serves the policy of protecting the public interest by 'prevent[ing] graft of every possible sort, and secur[ing] the honest and clean administration of [governmental] affairs.' *Noxubee County Hardware Co. v. City of Macon,* 90 Miss. 636, 43 So. 304, 305 (1907)." Also, it attests that §109 plainly "forbids public officers from having a direct or indirect interest in a contract authorized by the public body of which they are members during their term of office and for one year thereafter." However, the majority has not followed its own dictates in finding that Howell has not violated § 109.

¶44. In *Frazier v. State ex rel. Pittman,* 504 So.2d 675, 695 (Miss. 1987), we held that a conflict of interest in violation of §109 was present in situations where the spouse of a legislator was a teacher in the state educational system and that future infractions would be treated harshly. The majority has not been more harsh in this case. In fact, it has relaxed §109 to the point that it has no bite. There is no question that in the case sub judice Howell knew his actions were in violation of § 109. A simple comparison of the text of §109 to the behavior of Howell over the years indicates a complete disregard for §109 and shows that he, as a legislator, improperly ran his business. The holding of the majority - that Howell, a private business owner and legislator, was not directly involved in the appropriation of funds to his business from a public trust - is flawed. Howell voted and had influence on the appropriations bill(s). The majority should look

again at the Miss. Const. of 1890 Art. 4, § 109 which states:

> No public officer or member of the legislature shall be interested, directly, or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.

*Id.*

¶45. I also part company with the majority's decision to lump Read and Howell in the same category. While they are both legislators, their professional roles differ. Read did not violate § 109; he is too far removed. However, Howell's actions were in direct conflict with § 109. The majority cites *Hinds Community College Dist. v. Muse,* 725 So.2d 207, 211 (Miss. 1998) and *State ex rel. Miss. Ethics Comm'n v. Aseme,* 583 So.2d 955, 958 (Miss. 1991), and then turns around and uses Justice Prather's opinion (concurring in part and dissenting in part) in *Smith v. Dorsey,* 530 So.2d 5, 12-13 (Miss. 1988), as authority on the question of whether Howell and Read, by voting on appropriations to the Medicaid program, are guilty of self-dealing, and whether their interests could reasonably be expected to influence their judgment. Howell and Read, though they are both pharmacists in private practice, have differing business interests; and therefore, they should be treated separately.

¶46. The majority uses *Frazier* to support its contention that Howell has not violated §109. Indeed, it holds that to interpret §109 any other way would override the practical limits of §109, and it quotes *Frazier* in saying that to interpret §109 otherwise "would insult the common sense of our predecessors when they adopted §109." *Frazier*, 504 So.2d at 694. Section 109 means exactly what it says. That Howell knew he was in violation of this statute is evident from the fact that he attempted to put the business in his wife's name after the initial inquiry. To have the business in his wife's name would also constitute a violation under *Frazier*. A simple reading of *Frazier*, *Cassibry v. State,* 404 So.2d 1360 (Miss. 1981), §109, and *Muse* points to one conclusion: that the chancellor was correct in his ruling on this case as regards Howell and erred as to Read.

¶47. In *Muse*, this Court held that a § 109 violation existed even though Dr. Muse did not procedurally recommend his wife for the position at Hinds Community College, nor did he ever vote on the contract of his wife at the community college. To say that the case sub judice is not a violation of § 109 flies in the face of precedent. Howell, as a legislator, sets the amount of reimbursement for Medicaid providers and the procedures pharmacists are to follow in order to be paid their share. Even now using the new, fictitious criteria and the imaginary yardstick adhered to by the majority, the best analysis of this situation is one which would hinge upon whether the individual legislator is in a position to advance the personal interests of himself, his family and/or his friends to the detriment of ordinary citizens or other members of his professional class. The use of any other analysis would be tantamount to saying that honesty is no longer a trademark of government. To use the majority's measuring stick is to say that anyone can do anything. Accordingly, I dissent to the majority's decision regarding Howell.

¶48. I also dissent as to the majority's analysis concerning whether Read violated § 109. Read, a salaried employee of Controlex since 1971 and a member of the Mississippi House of Representatives since 1993, derives no direct gain from the legislature. The chancellor found Read to have an indirect financial interest in the Medicaid reimbursements paid to his employer, Controlex Enterprise, d/b/a Sav-Rex. Read insists that his interest in the participation agreements is so indirect as to be outside the restriction of § 109. I agree

with Read; thus it should be concluded that he has not violated § 109.

¶49. Under oath, Read testified that, since 1971, he has been only a salaried employee of Controlex. He has never been a partner or a shareholder in the company. Medicaid reimbursements are paid directly to Controlex and if Read receives any Medicaid funds, it is only indirectly in the form of salary. Read further stated that no portion of his salary is based on the percentage of Medicaid business the corporation does.

¶50. The main question in determining whether Read's interest is remote enough to warrant removal from the proscription of § 109 is whether his compensation depends upon payment being made under the contract. *Cassibry,* 404 So.2d at 1367. In order to answer this, we look at the facts in *Cassibry* and *Frazier*. In *Cassibry*, the primary distinction from the present case was that the Developmental Leaning Associates' ("DLA") only source of income was from its contracts with the Department of Welfare. Therefore, if Cassibry, a legislator and DLA's attorney, collected any amount of money from DLA, it was inarguably profit from its contracts with the Welfare Department. We concluded that Cassibry had a direct interest in the contract because his compensation was dependant upon payment being made under the contract. *Cassibry,* 404 So.2d at 1367. In the present case, although the compensation of Read's employer, Controlex, stems from its contract with Medicaid, we cannot infer this about Read's salary. He has testified that he receives no money from Medicaid, and there is no intimation that Read's salary would change if Controlex did not receive reimbursements from Medicaid.

¶51. In *Frazier*, the situation was different as it involved members of the legislature who appropriated funds which affected their employment contracts with a public school district and a state university as well as the employment contract of a legislator's wife, a school district employee. *Frazier*, 504 So.2d at 675. We found the legislators' involvement in their employment contracts to be in violation of § 109 as the appropriations went directly to the employers of the teachers/legislators for the purpose of funding their salaries. We also drew a line by holding that the employment contract of a legislator's wife who was employed by a school district, though technically appropriated by the legislature, did not rise to the level of a § 109 violation. As mentioned in the previous paragraph, Read's salary is not predicated upon the rate of Medicaid reimbursements received by his employer. Further, to find that Read's interest is within the proscription imposed by § 109, even indirectly, would prevent any citizen whose employer has a contract with the state from serving in the legislature.

¶52. In summation, because Controlex's Medicaid reimbursements do not affect Read's salary, his vote does not affect his income either. Therefore, it cannot be established that Read's interest could reasonably be expected to influence his judgment. *Smith v. Dorsey,* 530 So.2d at 12-13 (Prather, J., concurring in part and dissenting in part). Read is not in conflict with § 109, and the judgment of the chancery court as to him should be reversed and rendered. He should not be required to pay restitution or damages in any form.

¶53. For these reasons, I dissent.

**DIAZ, J., JOINS THIS OPINION.**